2014 COA 49

The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Leo J. CISNEROS, Defendant–Appellant.

Court of Appeals No. 09CA2717

Colorado Court of Appeals,
Div. IV.

Announced April 24, 2014

878

John W. Suthers, Attorney General, Kevin E. McReynolds, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Porter–Merrill, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE BOORAS

¶ 1 Defendant, Leo J. Cisneros, appeals the judgment of conviction entered on a jury verdict finding him guilty of possession with intent to distribute marijuana. He also appeals his enhanced sentence as a special offender. We affirm.

### I. Background

¶ 2 At around 10:30 p.m. on November 26, 2007, defendant was at home with his wife, four children, brother, and mother when there was a knock on his front door. The knock came from a group of five acquaintances who were armed and intending to rob defendant. When defendant's brother answered the door, one of the robbers pushed the door open and pointed a gun into the apartment. At that point, gunfire erupted.

The robbers fired shots into the apartment and defendant grabbed a handgun and fired shots toward the door. Defendant's ten-year-old daughter, who was caught in the crossfire, was shot in the head and died at the scene. It was not apparent who shot first or who fired the fatal shot.

¶ 3 Police and emergency services arrived shortly after the shooting. Officers entered the apartment and observed the victim's body on the floor in the living room, spent shell casings near the body, and a tray on the living room floor containing suspected marijuana. An officer spoke with defendant at the scene and, subsequently, a detective interviewed defendant at the police department several times. During the initial interview with the detective, defendant admitted that he owned a handgun and that he possessed and sold marijuana.

¶ 4 Police obtained a warrant and searched defendant's apartment. In addition to the items officers previously observed, the search recovered a bag of marijuana in the victim's hand, which was thrust into her pocket; $1145 in cash in a bedroom closet; the handgun and another gun on an armoire in a bedroom; a safe that had been under defendant's bed and which contained sixteen baggies of marijuana; a dresser drawer containing several boxes of live cartridge ammunition; and a gun-cleaning kit found on top of an armoire.

¶ 5 The People charged defendant with child abuse resulting in death, possession with intent to distribute marijuana, possession of marijuana—eight ounces or more, and one special offender count under the special offender statute's deadly weapon provision, Ch. 71, sec. 1, § 18–18–407(1)(f), 1992 Colo. Sess. Laws 362 (hereinafter section 18–18–407(1)(f)). The People alleged that defendant was an armed drug dealer who sold drugs out of his home, thereby placing his daughter in a situation that posed a threat of injury to her life or health and resulted in her death. Regarding the special offender count, the People alleged that defendant possessed the handgun in connection with his drug dealing business.

¶ 6 The defense contended that the armed robbers, rather than defendant, were responsible for creating the unreasonably dangerous situation in which defendant's daughter was placed. They also argued that defendant purchased the handgun not to further his drug business but for self-defense, asserting that defendant lived in a dangerous neighborhood and had purchased the gun for protection.

¶ 7 After a jury trial, defendant was acquitted of the child abuse charge but found guilty of possession with intent to distribute marijuana. The jury also determined that he was a special offender because he "use[d], possess[ed], or ha[d] available for use a deadly weapon during the commission of and in connection with the crime of Possession With Intent to Distribute Marihuana." Based on the jury's determination, defendant received an enhanced sentence of fifteen years in the custody of the Department of Corrections. This appeal followed.

## II.  Section 18–18–407(1)(f)

¶ 8  Section 18–18–407(1)(f), under which defendant was sentenced, provides that when an offender is guilty of possession of a controlled substance and the prosecution has pursued a special offender count, the jury must determine whether the offender "used, displayed, possessed, or had available for use a deadly weapon." If so, that determination constitutes an extraordinary aggravating circumstance, and the court is required "to sentence the defendant to the department of corrections for a term of at least the minimum term of years within the presumptive range for a class 2 felony but not more than twice the maximum term of years within the presumptive range for a class 2 felony." § 18–18–407(1)(f).[1]

### A.  Deadly Weapon Instruction

¶ 9  Defendant contends that the trial court erroneously denied his request for an elemental jury instruction concerning possession of a deadly weapon under section 18–18–

1. Section 18–18–407(1)(f) was enacted in 1992 and remained unchanged until 2010. Because the events in this case took place prior to 2010, the 2010 amendments to the special offender statute are irrelevant to this appeal. *See People v. Warner*, 251 P.3d 556, 566 (Colo.App.2010) (the 2010 amendment to section 18–18–407(1)(f) does not apply retroactively).

407(1)(f) and, instead, provided an instruction that omitted necessary elements. He argues that by refusing to provide an elemental instruction, the court (1) deprived him of his right to have a jury finding on each element of the greater offense; (2) misled the jury into thinking a different standard of proof applied to the special offender instruction because its form differed from the child abuse and possession instructions; (3) failed to "link the right to bear arms to the elemental special offender instruction so the jurors understood [that] liability under the special offender statute is limited"; and (4) confused the jury by providing an instruction that conflicted with the deadly weapon interrogatory on the possession with intent to distribute verdict form.

¶ 10 Defendant also argues that the verdict form did not require the jury to determine whether the prosecution proved beyond a reasonable doubt that defendant did not possess, display, or use the gun for the purpose of self-defense.

### 1. Preservation

¶ 11 Initially, we conclude defendant preserved his claim that an elemental instruction was required by objecting during the jury instruction conference that the deadly weapon special offender provision should be presented "as a separate offense with its own elements." [2] However, as to the contents of the elemental instructions and verdict forms, defense counsel's proposed language regarding the date of the offense and nexus to the marijuana offense was incorporated. Therefore, we perceive defendant's allegations of error on appeal to pertain only to the form of the special offender instruction, and not its contents.

### 2. Analysis

■ ¶ 12 Section 18–18–407(1)(f) acts as a sentence enhancement provision and not a substantive offense. *People v. Whitley*, 998 P.2d 31, 33 (Colo.App.1999). Nevertheless, any fact, other than a prior conviction, that increases the penalty for an offense beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

■ ¶ 13 The plain language of section 18–18–407(1)(f) indicates that it is triggered only after a felony drug conviction. Its effect, after the fact finder has entered a special finding as to the existence of the special offender circumstance, is to increase the required sentencing range. *See Whitaker v. People*, 48 P.3d 555, 560 (Colo.2002) (interpreting the importation provision of section 18–18–407).

■ ¶ 14 Here, although the trial court denied defendant's request for an elemental instruction for the special offender count, it instructed the jury to find the presence or absence of the special offender deadly weapon fact only if it found defendant guilty of the underlying offense of possession with intent to distribute:

> If you find defendant not guilty of possession with intent to distribute marihuana, you should disregard this instruction and fill out the verdict form reflecting your not guilty verdict. If, however, you find the defendant guilty of possession with intent to distribute marihuana, you should fill out the verdict form reflecting your guilty verdict, and then answer the following question:
>
> On November 26, 2007, did the defendant use, possess, or have available for use a deadly weapon during the commission of and in connection with the crime of possession with intent to distribute marihuana? It is the Prosecution's burden to prove beyond a reasonable doubt that the defendant used, possessed, or had available for use a deadly weapon during the commission of and in connection with the crime of possession with intent to distribute marihuana.
>
> After considering all the evidence if you decide the prosecution has failed to prove beyond a reasonable doubt that the defendant used, possessed, or had available for use a deadly weapon during the commission of and in connection with the crime of

---

**2.** Although defendant provides a proposed elemental instruction in his opening brief to this court, he did not provide such an instruction to the trial court.

possession with intent to distribute marihuana, you should indicate "no" on the verdict form that has been provided.

After considering all the evidence if you decide the prosecution has proven beyond a reasonable doubt that the defendant used, possessed, or had available for use a deadly weapon during the commission of and in connection with the crime of possession with intent to distribute marihuana, you should indicate "yes" on the verdict form that has been provided.

Your answer to the above question must be unanimous.

¶ 15 The jury verdict form for the possession with intent to distribute charge contained a special offender interrogatory that read: "Did [defendant] use, possess, or have available for use a deadly weapon during the commission of and in connection with the crime of Possession With Intent to Distribute Marihuana[?]"

¶ 16 We conclude the verdict form was not misleading because the instructions as a whole properly informed the jury of the elements of the sentence aggravator and the proof beyond a reasonable doubt burden. The special offender instruction required the jury to find, beyond a reasonable doubt, that the weapon was possessed "during the commission of and in connection with" the drug offense, thereby notifying the jury of the standard of proof and identifying a nexus requirement between the weapon and the drugs. Thus, the instructions contained the elements that the jury was required to find, although not in an elemental format. No error has been shown.

### B. Sufficiency of the Evidence

■ ¶ 17 Defendant also asserts that the trial evidence was legally insufficient to prove he possessed or used the gun on November 26, 2007, for the purpose of facilitating the drug offense and not for self-defense. We conclude the evidence was sufficient to support the jury's determination that defendant "used, displayed, possessed, or had available for use a deadly weapon" in connection with the commission of a drug offense.

¶ 18 In addressing a claim of insufficient evidence, we must uphold a conviction if the verdict is supported by substantial evidence,

viewed in the light most favorable to the prosecution. *Mata–Medina v. People*, 71 P.3d 973, 983 (Colo.2003). Evidence is sufficient when a rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Warner*, 251 P.3d 556, 564 (Colo.App.2010).

¶ 19 After trial, defendant moved for a judgment of acquittal on the grounds that there was no "showing of purposive conduct with that gun linking it to the marijuana and his possession of it with intent to distribute." The trial court denied his motion, and we agree with that determination.

¶ 20 Here, it was undisputed that defendant possessed a handgun. And, as the trial court noted, the People presented evidence that (1) one of defendant's stated purposes in owning the gun was to protect his property, which included nearly one pound of marijuana he held with an admitted intent to distribute it; and (2) the gun was found near a tray of marijuana and within feet of defendant, thus showing that this gun was available for use. Accordingly, there is sufficient evidence to support the jury's findings that defendant possessed both a controlled substance and a deadly weapon, and to infer a nexus between the controlled substance and the weapon. *See People v. Tweedy*, 126 P.3d 303, 308 (Colo.App.2005) (close spatial proximity between a weapon and drugs is sufficient for the jury to infer the required nexus).

### C. Constitutionality of Section 18–18–407(1)(f)

### 1. Section 18–18–407(1)(f) Does Not Violate the Right to Bear Arms in Self–Defense

¶ 21 Defendant contends that section 18–18–407(1)(f) violates the fundamental Second Amendment right to bear arms in self-defense, as recognized in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and also article II, section 13 of the Colorado Constitution. Because we conclude that the United States and Colorado Constitutions do not protect the unlawful purpose of possessing a firearm in

furtherance of a drug offense, we disagree that section 18–18–407(1)(f) infringes on the constitutionally protected right to bear arms.

¶ 22 Prior to trial, the trial court denied defendant's motion to declare section 18–18–407(1)(f) unconstitutional on grounds that it infringed on his fundamental state and federal rights. According to defendant's argument below and on appeal, he falls within the "central component" of the Second Amendment, which is the individual right to bear arms in self-defense. He asserts that "constitutional rights are not reserved only for law-abiding people," and that, regardless, he was not a criminal when he used the handgun for self-defense. He further argues that article II, section 13 of the Colorado Constitution provides even greater protection for the right to bear arms than the Second Amendment. Proceeding from the premise that he has a fundamental right to possess a weapon for self-defense, defendant urges that section 18–18–407(1)(f) must be subject to strict scrutiny, which he contends it cannot survive.

¶ 23 We review the constitutionality of statutes de novo. *Hinojos–Mendoza v. People,* 169 P.3d 662, 668 (Colo.2007). Statutes are presumed to be constitutional and the party challenging a statute's constitutionality must show the statute is unconstitutional beyond a reasonable doubt. *Id.*

### a. United States Constitution

¶ 24 First, we consider and reject defendant's contention that section 18–18–407(1)(f) prohibits conduct that is protected under the Second Amendment to the United States Constitution.

¶ 25 The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

¶ 26 In *Heller,* the Supreme Court held for the first time that the Second Amendment secures an individual right to keep and bear arms. 554 U.S. at 595, 128 S.Ct. 2783; *see also McDonald v. City of Chicago,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (extending the Second Amendment's reach to the states). The Court explained that, "whatever else [the

Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 554 U.S. at 635, 128 S.Ct. 2783. The Second Amendment right as identified in *Heller* is limited in scope and subject to some regulation. *Id.* at 625, 128 S.Ct. 2783. For example, the *Heller* court identified a non-exhaustive, illustrative list of "longstanding prohibitions on the possession of firearms" as "presumptively lawful regulatory measures." *Id.* at 626–27 n.26, 128 S.Ct. 2783.

¶ 27 Numerous federal courts have interpreted *Heller* in upholding the deadly weapon provision's federal counterpart, 18 U.S.C. § 924(c) (2014), which provides for a five-year prison sentence for any defendant who uses or carries a firearm in furtherance of a drug trafficking crime. *See United States v. Bryant,* 711 F.3d 364, 368–70 (2d Cir.2013) (addressing 18 U.S.C. § 924(c) in light of *Heller* and discussing other federal courts' decisions that have recognized limits on the exercise of Second Amendment rights under *Heller*).

¶ 28 In *Bryant,* for example, the United States Court of Appeals for the Second Circuit held that a defendant's conviction for unlawful possession of a firearm in furtherance of a drug trafficking crime did not violate his Second Amendment right to possess a firearm for self-defense in his home. *Id.* at 370. The court interpreted *Heller* as providing "an implicit limitation on the exercise of the Second Amendment right to bear arms for 'lawful purpose[s],'" and a limitation on ownership to that of "'law-abiding, responsible citizens.'" *Id.* at 369 (quoting *Heller,* 554 U.S. at 628, 630, 128 S.Ct. 2783).

¶ 29 We agree with the federal circuit courts that the Second Amendment entitles citizens to keep and bear arms for self-protection, but not for *all* self-protection. *Id.; see also United States v. Jackson,* 555 F.3d 635, 636 (7th Cir.2009). Here, defendant was distributing illegal drugs out of his home. Although defendant contends that he lived in a dangerous neighborhood and purchased the handgun for self-defense, "his decision to operate an illegal [drug] business [out of his

home] also matters." *Jackson*, 555 F.3d at 636. In *Jackson*, the court addressed a challenge to 18 U.S.C. § 924(c) on grounds similar to those presented in this case. *Id.* at 635. We find the court's reasoning in that case persuasive:

> The Constitution does not give anyone the right to be armed while committing a felony, or even to have guns in the next room for emergency use should suppliers, customers, or the police threaten a dealer's stash.... Suppose a ... statute said: "Anyone who chooses to possess a firearm in the home for self-protection is forbidden to keep or distribute illegal drugs there." Such a statute would be valid ... [a]nd if [the legislature] may forbid people who possess guns to deal drugs, it may forbid people who deal drugs to possess guns.

*Id.* at 636.

¶ 30 We conclude that the fundamental right conferred under the Second Amendment is the right for law-abiding, responsible citizens to bear arms for lawful purposes. Because section 18–18–407(1)(f) applies only to possession of a firearm in connection with a person's commission of a felony drug offense, it does not apply to law-abiding citizens and, thus, does not infringe on the Second Amendment right to bear arms. *See id.* ("there is no constitutional problem with separating guns from drugs").[3]

### b. Colorado Constitution

¶ 31 We next consider whether section 18–18–407(1)(f) implicates the right to bear arms as guaranteed by the Colorado Constitution, and hold that it does not.

¶ 32 Colorado's constitution includes a provision in its bill of rights establishing a right to keep and bear arms in defense of one's home, person, and property:

> The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained

shall be construed to justify the practice of carrying concealed weapons.

Colo. Const. art. II, § 13.

¶ 33 This provision was adopted in 1876 as part of Colorado's original constitution and has never been amended. *See People v. Carbajal*, 2012 COA 34, ¶ 1, —— P.3d ——. Like the Second Amendment—although worded differently—this provision does not provide an unlimited right to use a gun.

¶ 34 In *Robertson v. City & County of Denver*, 874 P.2d 325 (Colo.1994), the Colorado Supreme Court addressed a challenge to a city ordinance banning assault weapons on grounds that it violated article II, section 13 of the Colorado Constitution. Without deciding whether the right to bear arms as guaranteed under the Colorado Constitution was fundamental, the court held that "the state may regulate the exercise of that right under its inherent police power so long as the exercise of that power is reasonable." *Id.* at 328. Thus, a statute limiting the right to bear arms in self-defense should be held unconstitutional under the Colorado Constitution only if the defendant establishes that the statute does not regulate "under [the state's] police power in a reasonable manner." *Id.* at 331.

¶ 35 Because we conclude that *Heller* did not call into question section 18–18–407(1)(f)'s prohibition on using, possessing, or having available for use a firearm during the commission of a drug offense, we see no reason to speculate that our supreme court would modify its holding in *Robertson* in light of *Heller*.

¶ 36 Thus, as stated in *Robertson*, the appropriate question in analyzing a challenge to a statute pursuant to article II, section 13 of the Colorado Constitution is whether the provision was a legitimate exercise of the state's police power. A statute is within the state's police power if it is "reasonably related to a legitimate governmental interest such as the public health, safety, or

---

3. Because we conclude that defendant had no Second Amendment right to possess a gun in connection with a felony drug offense, we need not decide whether strict scrutiny or intermediate scrutiny would apply. *See United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir.2010)

(recognizing two-step inquiry suggested by *Heller*: courts first determine whether a challenged law burdens conduct falling within the scope of the Second Amendment, and if so, then evaluate the law under the appropriate form of means-end scrutiny).

888

welfare." *Id.* In *People v. Atencio,* 878 P.2d 147 (Colo.App.1994), a division of this court applied *Robertson* in rejecting an article II, section 13 challenge to section 18–18–407(1)(f). We see no reason to depart from that decision today and hold that, for the reasons stated in *Atencio,* section 18–18–407(1)(f) "is reasonably related to a legitimate governmental interest and constitutes a valid exercise of the state's police power and does not violate the right to bear arms in self-defense as protected by the Colorado Constitution." *Id.* at 150 (because of increased risk of injury or death to private citizens and law enforcement personnel, the state may reasonably regulate the combination of drugs and weapons).

¶ 37 To the extent that the Colorado Constitution enumerates "defending their lives" among the "essential and inalienable rights" of "[a]ll persons," prohibiting guns in connection with drug dealing does not prevent a person from using a gun in self-defense. *See* Colo. Const. art. II, § 3. Because defendant elected to deal drugs from his home and to keep guns available for use in connection with that drug-dealing in close proximity to his drug supply both in his living room and his bedroom, he has violated the special offender statute, even if he fired a shot from his gun to defend his life.

### 2. Section 18–18–407(1)(f) Is Not Unconstitutionally Overbroad

¶ 38 We next address defendant's argument that section 18–18–407(1)(f) is unconstitutionally overbroad on its face and as applied to him. Defendant argues that "[t]he deadly weapon provision, as currently interpreted [in Colorado], criminalizes the use or possession of a gun unrelated to a drug transaction and is, thus, unconstitutional." He also contends that the nexus requirement, as articulated in *Atencio,* is insufficient to protect the right to bear arms in self-defense because "people are adjudicated special offenders even if they possess a gun for self-defense."

¶ 39 Whether a statute is unconstitutionally overbroad is a question of law that we review de novo. *People v. Martinez,* 165 P.3d 907, 912 (Colo.App.2007). "A statute which proscribes conduct which can be prohibited under the police power of the

state is overbroad if it also purports to proscribe conduct which cannot validly be prohibited under that power." *People v. Sequin,* 199 Colo. 381, 384, 609 P.2d 622, 624 (1980). A statute is facially overbroad if it sweeps within its reach constitutionally protected, as well as unprotected, activities. *Robertson,* 874 P.2d at 330. However, facial challenges are disfavored and a person to whom a statute was constitutionally applied " 'will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.' " *Sequin,* 199 Colo. at 384, 609 P.2d at 624 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); *see also United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (noting the Court has not recognized an overbreadth doctrine outside the limited context of the First Amendment). Because we conclude that the deadly weapon provision was constitutionally applied in this case, we decline to address defendant's facial challenge.

¶ 40 Here, we perceive no overbreadth in the statute as applied. *See Sequin,* 199 Colo. at 384, 609 P.2d at 624. The conduct here could validly be prohibited under the state's police power; it did not involve a substantial amount of activity that is constitutionally protected.

¶ 41 First, as previously discussed, the right to bear arms may be regulated by the state under its police power in a reasonable manner. *Id.* Section 18–18–407(1)(f) does not implicate the right of a law-abiding citizen to bear arms for lawful purposes—it applies only to persons who possess guns during the commission of a drug offense. Once defendant possessed drugs with the intent to sell them in his home and had a gun available for use in connection with that offense, he was no longer simply a law-abiding citizen using the handgun for a lawful purpose.

¶ 42 Section 18–18–407(1)(f) requires a relationship between the deadly weapon and the drug offense. *Atencio,* 878 P.2d at 149–50 (The language of section 18–18–407(1)(f), "used, displayed, possessed, or had available for use a deadly weapon," includes "nexus terms" and "[t]hus, by the express language

of the statute itself, the People are required to show some nexus between the deadly weapon and the drug offense upon which the enhanced sentence is based."). Consequently, the restriction in section 18–18–407(1)(f) does not implicate the constitutionally protected right of a law-abiding citizen to bear arms for lawful purposes because the possession or use of the deadly weapon must be connected to the illegal drug offense.

¶ 43 Here, defendant argues that his possession of the handgun upon which his enhanced sentence was based was unrelated to the drug offense, and that the special offender conviction therefore punished him for exercising his right to possess and use a gun in self-defense. However, by returning the special verdict form containing nexus language, the jury found, contrary to defendant's contentions, that his possession of the handgun was related to his drug offense. Both the special offender instruction and jury verdict form directed the jury to determine whether defendant "use[d], possess[ed], or ha[d] available for use a deadly weapon during the commission of and in connection with the crime of possession with intent to distribute marihuana." Thus, because defendant possessed a deadly weapon in connection with his commission of a felony drug offense, his conviction under section 18–18–407(1)(f) did not infringe on any constitutionally protected activities, and as applied here, is not unconstitutionally overbroad.

### 3. Section 18–18–407(1)(f) Is Not Unconstitutionally Vague

¶ 44 We also reject defendant's assertion that section 18–18– 407(1) (f) is unconstitutionally vague. A statute is unconstitutionally vague if it: (1) does not give fair notice of the conduct prohibited and (2) does not supply adequate standards for those enforcing it in order to prevent arbitrary and discriminatory enforcement. See People v. Holmes, 959 P.2d 406, 414 (Colo.1998).

¶ 45 Section 18–18–407(1)(f) requires a finding that the defendant "used, displayed, possessed or had available for use, a deadly weapon." This language is the same language held valid against a vagueness challenge by a division of this court in Atencio. 878 P.2d at 150–51 (concluding that section 18–18–407(1)(f) was not unconstitutionally

vague with regard to either the definition of "deadly weapon" or its prohibition on the use, display, possession, or availability of use of such weapons). There, the enhanced sentence was based on firearms found in the defendant's residence. The division concluded that section 18–18–407(1)(f) was not vague with respect to the term "deadly weapon" because firearms are capable of producing death or bodily harm in the manner they are used or intended to be used. Id. at 150. The division also reasoned that the ordinary and commonplace definitions of the terms "used," "displayed," "possessed," or "available for use" provide fair notice and are in accord with previous decisions of the court of appeals and supreme court. Id. at 151. We agree with the reasoning in Atencio and conclude that section 18–18–407(1)(f) is facially valid for the same reasons.

¶ 46 Defendant's vagueness challenge to section 18–18–407(1)(f) as applied to him also fails. The terms of the provision provide fair notice of the conduct prohibited and set forth adequate standards for enforcement so as to prevent arbitrary application.

¶ 47 Defendant urges that because the robbers possessed firearms while committing a separate drug offense prior to the robbery, they too should have been charged with possession of a controlled substance and subjected to the deadly weapons provision, and the prosecution's failure to do so was arbitrary and discriminatory. We are not persuaded— the prosecution's decision in this case regarding whether to charge the robbers as special offenders does not establish that the statute is unconstitutionally vague or was arbitrarily or discriminatorily applied. See People v. Kurz, 847 P.2d 194, 196 (Colo.App.1992) (noting that "[a] district attorney has wide discretion in determining who to prosecute for criminal activity and on what charge"). Defendant was convicted of a controlled substance offense and the jury also determined that he used, possessed, or had available for use a deadly weapon. Thus, defendant was properly subject to an enhanced sentence pursuant to section 18–18–407(1)(f).

#### D. Defendant Was Not Entitled to a Right to Bear Arms Instruction

¶ 48 Defendant next contends that the trial court erred by refusing his tendered right to bear arms instruction. We perceive no error.

¶ 49 The defendant tendered, and the court rejected, the following instruction regarding the right to bear arms:

*Constitutional Right to Keep and Bear Arms—Defendant not a Prohibited Person—Firearms Registration*

The Second Amendment to the United States Constitution and Article II, Section 13 of the Colorado Constitution guarantee to [defendant] the right to possess, carry, and use a firearm, including a handgun, in defense of his home and for the safety of himself and his family.

You are instructed that on the date charged in this case [defendant] was not prohibited from purchasing, owning, possessing, or using a firearm, including a handgun, by virtue of having been convicted of any criminal offense under state or federal law.

You are also instructed that there is no legal requirement in the State of Colorado or under federal law to register a handgun.

¶ 50 We conclude that the trial court did not abuse its discretion by refusing this tendered instruction.

¶ 51 A defendant's use or possession of a gun can simultaneously be for the purpose of self-defense against intruders, and also for the purpose of protecting a drug supply from intruders. Even if the use of the gun for self-defense would ordinarily be constitutionally protected, the simultaneous use of the gun to protect drugs is punishable through an enhanced sentence for drug possession with the intent to distribute.

¶ 52 Here, the jury would not have been able to find that the weapon was used *solely* for a constitutional self-defense purpose, because in order to make the special offender finding, the jury was required to find that the gun was used, possessed, or available for use during the commission of and *in connection with* the crime of possession with intent to distribute marihuana. Thus, the nexus requirement eliminated any violation of a defendant's right to bear arms because a defendant has no such right "in connection with" drug-dealing. Even if defendant kept or used his gun to protect his family, he was subject to enhanced punishment because it was also connected to his possession with intent to distribute marijuana.

¶ 53 Relying on *People v. DeWitt*, 275 P.3d 728, 733 (Colo.App.2011), defendant urges that, under the Colorado Constitution, he is entitled to assert the right to bear arms in self-defense as an affirmative defense. However, *DeWitt*, unlike this case, involved charges of possession of a weapon by a previous offender (POWPO). Possession of a weapon in the POWPO context is illegal by virtue of the defendant's status, and not by virtue of simultaneous illegal conduct.[4] Here, the enhanced sentence was not triggered by defendant's status, but rather by his otherwise illegal conduct. "Otherwise illegal conduct does not somehow become immunized because possession of a firearm is involved in the offense." *United States v. Huet*, 665 F.3d 588, 602 (3d Cir.2012) (the defendant's right to keep a rifle in her home did not give her the right to facilitate felon cohabitant's possession of a firearm).

¶ 54 In light of our prior determination that defendant had no state or federal constitutional right to bear arms during the commission of his drug offense, we find no error in the court's denial of defendant's proposed instruction on the right to bear arms.

### III. Other Issues

#### A. Motion to Suppress

¶ 55 Defendant contends reversal is required because the trial court violated his Fifth Amendment and Fourteenth Amendment rights when it denied his motion to

---

4. Courts have questioned status-based restrictions on the right to bear arms, unless the status supports some danger in the possession of a weapon. *See, e.g., Fletcher v. Haas*, 851 F.Supp.2d 287, 303 (D.Mass.2012) (finding unconstitutional a firearms regulatory scheme that granted firearms permits only to "citizens" and not to lawful permanent resident aliens); *see also United States v. Booker*, 644 F.3d 12, 24 n.13 (1st Cir.2011) (noting "substantial debate among scholars" concerning "historical pedigree of laws disarming those convicted of a crime").

suppress statements he made to law enforcement officers. He argues that these statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that his *Miranda* waiver was ineffective under *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), because investigating officers used an improper question-first, warn-later technique. He also contends that his statements were involuntary. We conclude that the trial court did not err by denying defendant's motion to suppress.

¶ 56 A trial court's ruling on a motion to suppress presents a mixed question of fact and law. *People v. Adkins*, 113 P.3d 788, 790 (Colo.2005). However, where statements sought to be suppressed are audio- and video-recorded, we undertake an independent review of the undisputed facts in the recording to determine whether the statements should be suppressed. *People v. Madrid*, 179 P.3d 1010, 1014 (Colo.2008). In our review, we defer to the trial court's determinations concerning disputed facts that occurred outside of the interview if they are supported by competent evidence in the record. *People v. Gennings*, 808 P.2d 839, 844 (Colo.1991).

### 1. Background

¶ 57 During the investigation of this case, defendant provided statements to law enforcement officers both before and after receiving *Miranda* warnings. His unwarned statements include (1) a statement he made to an officer outside his apartment shortly after the shooting and (2) initial statements he made in speaking with a detective in an interview room at the police department approximately two hours after the shooting occurred. After receiving a *Miranda* advisement, he continued to speak with the detective until the interview concluded, and later agreed to speak in two subsequent interviews during the investigation.

¶ 58 Before trial, defendant filed a motion to suppress, arguing that (1) the statements he made before receiving *Miranda* warnings occurred during custodial interrogation; (2) the statements he made after receiving *Miranda* warnings were inadmissible because they were tainted by the illegality of his initial interrogation and the *Miranda* warnings were ineffective because the officer used an improper "successive interrogation" tactic; and (3) the statements were involuntary and their admission would violate due process.

¶ 59 The trial court denied the motion to suppress. First, the court found that defendant was not in custody and was not being interrogated when he provided his statement to the officer at the scene. The court further found that defendant was not in custody while in the waiting room at the police department, noting that "[p]olice interrogation at a stationhouse does not necessarily render the interrogation custodial for purposes of the *Miranda* warning." *People v. Matheny*, 46 P.3d 453, 466 (Colo.2002). The trial court concluded that "[t]he totality of the circumstances should have led a reasonable person in this situation to believe that he was a witness only."

¶ 60 As to the Fifth Amendment voluntariness argument, the trial court concluded that defendant's pre-*Miranda* statements were voluntary, his waiver of his *Miranda* rights was knowing, intelligent, and voluntary, and the statements he made after receiving *Miranda* warnings were voluntary. Finally, the court declined to suppress the statements defendant made in his subsequent interviews with law enforcement officers, finding that the statements were voluntary and were not obtained in violation of *Miranda*: "Defendant further alleges these were serial interrogations, each building on the initial un-Mirandized statement and are prohibited under *Seibert*. I find these are not the sort of interviews disapproved by *Seibert*, but a series of continuous witness interviews based upon developing information."

### 2. Facts

¶ 61 Defendant contends on appeal that he was in custody "within minutes of his daughter's death." However, we agree with the trial court's conclusion that defendant was not in custody prior to being advised of his *Miranda* rights.

¶ 62 At the pretrial hearing on defendant's motion to suppress, the testimony established the following facts. Officers arrived shortly after the shooting occurred and began to separate the witnesses, including de-

fendant and his family members, from each other. An officer began taking a statement from defendant because he understood defendant's daughter had just been shot, and he "was trying to be as—sensitive as [he] could to the situation." The officer asked if defendant would be willing and able to write down exactly what happened, but did not advise defendant pursuant to *Miranda*. Defendant agreed and began to write a statement. However, because he was too upset to write, the officer wrote his responses for him.

¶ 63 Defendant informed the officer that an unidentified person had knocked on his door, his brother answered, and the person asked, "What's up Homie[?]" Defendant said his brother tried to close the door and the person forced the door open and began firing a small semi-automatic pistol into the residence. Defendant said the suspect fled from the residence, firing several more shots as he ran.

¶ 64 After receiving defendant's statement, the officer asked him to sit in the back of a patrol car, and defendant asked if he was under arrest. The officer advised defendant that he was not under arrest but was being separated from the other witnesses.

¶ 65 After being taken to the police station, defendant sat in a room with his wife while he waited to be interviewed by a detective. They were not restrained or in custody, but an officer was present to ensure that they did not speak to each other.

¶ 66 Rather than providing an immediate *Miranda* advisement, the detective introduced himself, asked defendant if he understood how important it was to be truthful, and then asked defendant to tell him what happened. The detective advised defendant that the interview would be video-recorded, and defendant agreed to provide a statement.

¶ 67 Defendant again described his brother's struggle after answering a knock at the door, and said he saw the suspect raise a gun and start shooting. His wife started screaming and he saw his daughter lying on the floor. The detective commented on defendant's tattoos and asked if defendant was a member of a gang and whether defendant had had problems before with anyone. Defendant explained that his family had been involved in a prior altercation and his apartment had been "robbed" previously by a person called "Lips."

¶ 68 Turning to the person who had knocked on defendant's door that night, the detective asked, "what did this person want?" Defendant said that maybe this person wanted money, but he had not asked for money. Defendant described the shots he heard during the encounter, and the detective asked if anyone inside the house returned fire. Defendant said, "I did," and admitted that he had "shot off a whole clip." The detective asked if defendant could have accidentally hit his daughter, and defendant replied, "I hope not, I hope not, I hope not, I hope not. She was off to the right to me, she was off to the right to me." The detective said, "sounds like there might be a possibility?" and defendant replied, "no, I don't think so. I mean if it is it was just like so fast, if it is, if it is ... I'd kill myself if it is, if it is." He then said:

I don't care if I get in trouble here it is I don't give a fuck like, him I really don't know ... but when he started shooting I jumped up and I started shooting back because I noticed the door was opening and I seen a gun in his hand so I—I cocked my gun and I started shooting back.

¶ 69 At that point, the detective interrupted defendant to provide a *Miranda* advisement. Defendant was given an oral *Miranda* advisement, and then he signed a written form acknowledging that he understood those rights and was willing to voluntarily speak with the detective.

¶ 70 After receiving the *Miranda* advisement, defendant explained the shots he fired. He said that, originally, his gun had been under the couch on the floor. When he saw his brother trying to shut the door, he turned around, grabbed the gun, and fired toward the intruders. He also indicated that the gun he fired was now in his bedroom and that there was an additional pistol and ammunition in his bedroom. He said that his handgun was under the couch because he had just finished cleaning it. He also said he possessed guns in the house because people had tried to break in and had kicked in his door. Additionally, defendant admitted that he had approximately fifteen ounces of mari-

juana in a box underneath his bed, and that he occasionally sold marijuana. Defendant said that the suspect might have thought that he had money from the marijuana sales.

### 3. *Miranda* Analysis

¶ 71 "To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing in its case-in-chief any statement, whether inculpatory or exculpatory, procured by custodial interrogation, unless the police precede their interrogation with certain warnings." *Effland v. People*, 240 P.3d 868, 873 (Colo.2010) (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). *Miranda* protections apply only when a suspect is subject to both custody and interrogation. *Id.*

¶ 72 Whether a suspect is in custody for *Miranda* purposes is a question of law that we review de novo. *Id.* To determine whether a suspect has been subjected to custodial interrogation, we consider " 'whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest.' " *Id.* at 874 (quoting *People v. Hankins*, 201 P.3d 1215, 1218 (Colo.2009)). In making this determination we consider whether, under the circumstances surrounding the interrogation, a reasonable person would have felt free to terminate the interrogation and leave. *Id.* For *Miranda* purposes, "interrogation" includes express questioning as well as its functional equivalent, that is, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v. Rivas*, 13 P.3d 315, 319 (Colo.2000) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

¶ 73 First, we conclude *Miranda* warnings were not required before the officer received defendant's statement at the scene of the shooting. The officer requested the statement from defendant to further the on-scene investigation. The officer testified that he was aware of defendant's emotional state and attempted to be "sensitive" in speaking with defendant, and that he informed defendant he was not under arrest or otherwise in custody. The trial court credited the officer's testimony, and we agree with the trial court that defendant was not in custody when he provided a statement at the scene of the shooting.

¶ 74 Second, as to the statements defendant made to the detective at the police department, we perceive no *Miranda* violation. The interviews were conducted for the purpose of furthering the investigation, and defendant was not placed under arrest or restrained prior to being interviewed. The video-recording of the initial interview with the detective reveals that the detective did not accuse defendant of committing a crime. Rather, he asked defendant for his account of the events surrounding the shooting. The detective did not threaten or intimidate defendant and spoke in a calm and conversational tone. We conclude that, under the circumstances presented here, defendant was not in custody for purposes of *Miranda* prior to being given his *Miranda* advisement. *See Mumford v. People*, 2012 CO 2, ¶ 21, 270 P.3d 953 (concluding the defendant was not in custody where "at the time of his questioning, there was nothing to indicate that [the defendant] was ultimately going to be arrested rather than simply detained temporarily during a search focused primarily on someone else" (internal quotation marks omitted)); *see also Matheny*, 46 P.3d at 467–68.

¶ 75 Third, regarding defendant's contention that the trial court should have suppressed his incriminating statements under *Seibert*, we disagree.

¶ 76 Certain interrogation techniques can render *Miranda* warnings ineffective. *People v. Lucas*, 232 P.3d 155, 160 (Colo.App.2009). In *Seibert*, police officers interrogated the defendant, but deliberately delayed advising her of her *Miranda* rights until after she confessed to certain crimes. 542 U.S. at 605–04, 124 S.Ct. 2601. The officers then provided a *Miranda* advisement, obtained a waiver, and continued to question her until she repeated the earlier incriminating statements. *Id.* The object of this technique, which then enjoyed some popularity, *see id.* at 610–11, 124 S.Ct. 2601, was

"to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 124 S.Ct. 2601. Under these circumstances, it was necessary to determine "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object." *Id.* at 615, 124 S.Ct. 2601.

¶ 77 However, as the trial court found, the interviews here were not the sort of interviews disapproved by *Seibert.* Here, the pre-*Miranda* conversations did not occur during custodial interrogation and defendant did not admit to possessing marijuana before he received a *Miranda* warning. Thus, unlike in *Seibert,* the information defendant provided prior to receiving a *Miranda* advisement was not necessarily incriminating. When defendant began to make potentially incriminating remarks, the detective promptly provided a *Miranda* warning. Hence, the type of "midstream" warning that was deemed ineffective in *Seibert* did not occur in this case.

¶ 78 We therefore agree that defendant's pre-*Miranda* statements did not invalidate the subsequent *Miranda* advisement.

### 4. Voluntariness Analysis

¶ 79 Defendant also argues that the police exploited his mental and physical condition, and, thus, his statements were involuntary and should have been suppressed. We perceive no due process violation.

¶ 80 "Under the due process clauses of the United States and Colorado Constitutions, a defendant's statements must be made voluntarily in order to be admissible into evidence." *Effland,* 240 P.3d at 877. "To be voluntary, a statement must be 'the product of an essentially free and unconstrained choice by its maker.'" *Id.* (quoting *People v. Raffaelli,* 647 P.2d 230, 234 (Colo. 1982)). A confession or inculpatory statement is voluntary unless coercive police conduct played a significant role in inducing the statement. *Id.* Coercive police conduct includes physical abuse, threats, and subtle forms of psychological coercion. *Id.* "The focus of the voluntariness question is 'whether the behavior of the State's law enforcement officials was such as to overbear [the

defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not the [defendant] in fact spoke the truth.'" *Id.* (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)).

¶ 81 In determining whether a statement is voluntary, courts consider the totality of the circumstances. The prosecution bears the burden of establishing the voluntariness of the defendant's statement by a preponderance of the evidence. *Id.* at 878. "A trial court's findings of fact on the voluntariness of a statement will be upheld by this court on review where the finding is supported by adequate evidence in the record." *Id.* "However, the ultimate determination of whether a statement is voluntary is a legal question and is reviewed de novo." *Id.*

¶ 82 Here, defendant contends that the detective used psychological intimidation to coerce him into making incriminating statements. He argues that "[the detective] deliberately exploited [his] emotional and psychological vulnerability—having just watched his daughter die—by psychologically intimidating him into making incriminating statements regarding his marijuana sales and gun possession." We conclude, however, that the detective did not engage in coercive conduct.

¶ 83 In *Effland,* the Colorado Supreme Court held that "the deliberate exploitation of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." 240 P.3d at 877. In that case, police officers interrogated the defendant, who was suffering from extreme depression, in his hospital room after a failed suicide attempt that resulted in the deaths of his wife and daughter. The court determined that the conduct of investigating officers was sufficient to overbear the defendant's will to resist, thereby rendering his statements involuntary. The investigating officers' continued questioning in the face of the defendant's invocation of his rights to remain silent and to counsel was of particular significance in reaching this determination. *Id.*

¶ 84 Here, however, the circumstances that supported the supreme court's conclusion in *Effland* are not present in this case. Unlike in *Effland*, there was nothing to suggest that defendant was suffering from depression or was otherwise in an extraordinarily weakened physical or mental state. Although we recognize defendant was in a vulnerable state after witnessing the death of his daughter, his demeanor when speaking with the detective did not suggest that he was susceptible to making a statement because of his emotional state. And, regardless, a defendant's weakened mental condition, in the absence of deliberate exploitation and intimidation by law enforcement officers, is insufficient to render the defendant's statements involuntary. *See Gennings*, 808 P.2d at 844 ("While a defendant's mental condition, by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness, the deliberate exploitation of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." (citation omitted)).

¶ 85 The video-recordings of the interviews show that the detective did not engage in conduct designed to exploit defendant's vulnerable state or intimidate him into making incriminating statements. The detective's manner throughout the interviews was calm and conversational and he did not brandish a weapon, raise his voice, make threats, or invade defendant's personal space. Defendant was lucid and alert throughout the interviews. When he was advised pursuant to *Miranda*, he voluntarily waived his rights. Finally, he did not ask to end the questioning or to speak with counsel, even after he was informed orally and in writing, through his *Miranda* advisement, that he had the right to do so. Accordingly, under the circumstances presented here, we conclude that defendant's statements during his initial interview with the detective, and interviews on subsequent dates, were not the product of government coercion.

¶ 86 In sum, given the totality of the circumstances, we are satisfied that defendant's statements to law enforcement officers were given deliberately and freely. *See People v. Miranda–Olivas*, 41 P.3d 658, 661 (Colo.

2001) ("Ultimately, the test of voluntariness is whether the individual's will has been overborne."). Therefore, we conclude that the trial court did not err in denying the motion to suppress.

### B. Juror Challenge

¶ 87 We next consider whether the trial court erred in denying defendant's causal challenge to a juror who worked as a Denver Post reporter. We conclude that it did not.

#### 1. Facts

¶ 88 Mr. I, a potential juror, indicated in a juror questionnaire that he worked as a reporter for the Denver Post and had read extensively about the case and "overheard colleagues talking about the case and perhaps joined in those conversations." In addition, he responded "Yes" to a question that asked, "Do you believe there is any other reason why you cannot be a fair juror in this criminal case?" He explained in writing, "As a general assignment reporter, I often interact with members of the Denver Police Dept. [and] the Denver DA's office."

¶ 89 The court conducted an in chambers voir dire with several potential jurors, including Mr. I, whose responses raised concerns regarding their ability to be impartial. The court asked Mr. I about his familiarity with the facts of defendant's case and whether he could listen to the evidence as presented and determine what happened. Mr. I responded:

> MR. I: Okay. Well, my understanding from reading the newspaper, from listening to the reports and talking to colleagues or at least overhearing colleagues is that the defendant was possibly dealing drugs. That there was an incident where some folks came into his house. As a result of that there was a shoot out. The defendant's little girl somehow got caught in the crossfire and was hit. And there may have been, if I'm recalling correctly, something found on her. She was holding something, possibly a bag of marijuana.
>
> THE COURT: Okay. Anything about those facts, those understandings as you've just recited them, that would cause you any prejudice or bias either for the People or for [defendant] one way or the other?

MR. I: Well, those facts as I just repeated them certainly don't sound good for the defendant. But that's sort of the purpose of the trial is to figure out what actually happened.

THE COURT: Okay. And so you think you would be in a position to be able to listen to the evidence as it is presented and determine what happened?

MR. I: Sure, I would certainly do my best.

¶ 90 Mr. I also discussed how his relationship with law enforcement agencies might affect his job as a newspaper reporter. He indicated that "being in the good graces of the DA or the police department" would be helpful, but that this would not affect his approach to serving as a juror:

If I were on the jury I would need to take the duty seriously. So absolutely to my best I would not think about those things. But I think it could create an awkward situation.

Defense counsel further explored Mr. I's relationship with the police and prosecutors, questioning whether the "awkward situation" would make Mr. I uncomfortable during the trial. Mr. I admitted that it would be "concerning," but stated that if he were on the jury, he would do his best to listen to the facts and to make the right decision. He also clarified that potential awkwardness would be more likely to occur after trial rather than during trial.

¶ 91 Finally, defense counsel questioned whether the awkward situation would cause Mr. I to have doubts about his ability to decide this case based on its facts and evidence and the law as instructed by the judge. Mr. I responded:

Well, again, if I were placed on the jury, I would certainly—I would take it seriously, and I would do my absolute best. I think that might be something that would stick in the back of my mind. It is not to say I couldn't put it out.

DEFENSE COUNSEL: I'm not questioning that you would try your best or that you didn't take it seriously. Does this awkward situation make it such that you didn't want to serve on this jury?

MR. I: Yeah.

¶ 92 After this response, defense counsel moved to excuse Mr. I for cause:

[Mr. I] doesn't want to be on this jury because of the adverse impact he is afraid it is going to have on his profession. He is going to have his own paper watching him perform on the jury. He already said that the dynamics of this favor his convicting our client unless he's able to disregard this awkward situation.

¶ 93 The court brought Mr. I back in for further questioning about the pressure he might feel as a result of his job. Mr. I assured the court that he would not provide inside information about the case to other reporters. The court then denied the challenge for cause, noting, "[h]e was pretty clear that if he's chosen to sit on this jury he'll do what the law requires and if there are consequences he'll deal with them." The following day, defense counsel renewed the challenge and the court denied the challenge a second time. Defense counsel used a peremptory challenge to excuse Mr. I and ultimately exhausted all of his peremptory challenges.

### 2. Law

¶ 94 Section 16–10–103(1)(j), C.R.S.2013, requires a trial court to sustain a challenge for cause if a juror's state of mind evinces enmity or bias toward the defendant or the state. Similarly, Crim. P. 24(b)(1)(X) requires disqualification of a juror if his or her state of mind manifests a bias for or against either side, unless the court is satisfied that the juror will render an impartial verdict based solely upon the evidence and instructions of the court. *See Morrison v. People,* 19 P.3d 668, 672 (Colo.2000); *People v. Shreck,* 107 P.3d 1048, 1057 (Colo.App. 2004). A prospective juror who makes a statement that may evince bias may sit on the jury so long as he or she agrees to set aside any preconceived notions and decide the case based on the evidence and the court's instructions. *Carrillo v. People,* 974 P.2d 478, 487 (Colo.1999).

¶ 95 Because the trial court is in a better position than a reviewing court to evaluate a potential juror's credibility, demeanor, and sincerity in explaining his or her state of mind, we will overturn its decision concerning a challenge for cause only upon an affirmative showing by the defendant that the

court abused its discretion. *Shreck*, 107 P.3d at 1057. A trial court's ruling on a challenge for cause will be reversed as an abuse of discretion only if there is no evidence in the record to support it. *People v. Richardson*, 58 P.3d 1039, 1042 (Colo.App.2002); *see also Carrillo*, 974 P.2d at 486 (appellate court must examine the entire voir dire of the prospective juror).

### 3. Analysis

¶ 96 On appeal, defendant argues that the trial court abused its discretion in denying the causal challenge to Mr. I because: (1) Mr. I's questionnaire response and statements indicated he believed the defendant was guilty and that he could not be a fair and impartial juror and (2) his job as a Denver Post reporter made him reliant on Denver police and district attorneys and would impact his ability to serve. He also contends that, when combined, these factors required the court to disqualify him for cause.

¶ 97 We conclude that the trial court did not abuse its discretion in denying defendant's challenge for cause. Although Mr. I's responses on the questionnaire may have initially raised questions about his ability to be fair and impartial, the record as a whole supports the trial court's decision to deny defendant's challenge.

¶ 98 Initially, we reject defendant's contention that the court erred in refusing to dismiss Mr. I because he "never agreed to set aside his preconceived belief [defendant] was guilty, and he never repudiated his belief he could not be a fair and impartial juror." First, defendant has not established that Mr. I held a preconceived belief that defendant was guilty. Mr. I's statement that the facts "certainly don't sound good for the defendant" does not necessarily suggest that he believed defendant was guilty. Second, he assured the court that he would do his best to listen to the evidence as it is presented and determine what happened, and that he would take his duty as a juror seriously. These responses were sufficient to support the trial court's finding that he could be fair and impartial. *See People v. Samson*, 2012 COA 167, ¶¶ 21–22, 302 P.3d 311 (court acted within its discretion in denying the defendant's challenge for cause, where juror af-

firmed that he would give the defendant a " 'fair shake' " and would do his " 'best to be fair and impartial and listen to the evidence in its totality' "); *see also Morrison*, 19 P.3d at 673 (denial of for-cause challenge of a juror who was allegedly predisposed to find the defendant guilty was not an abuse of discretion because none of the juror's statements "suggests that she would be unable to afford the defendant the presumption of innocence or that she would fail to render her verdict based on the evidence"); *cf. People v. Hancock*, 220 P.3d 1015, 1016 (Colo.App. 2009) ("[D]enials of challenges for cause have been reversed where prospective jurors have made statements demonstrating bias and there are no other statements in the record that would permit the reviewing court to affirm based on deference to the trial court's assessment of unclear or ambiguous responses.").

¶ 99 As to defendant's claim that Mr. I's relationship with the Denver police department and prosecutors created a bias in favor of the People, again, we are not persuaded. Here, Mr. I indicated that serving on the jury may be "awkward" due to his professional relationship with law enforcement agencies, but also stated, "if I were placed on the jury, I would certainly—I would take it seriously, and I would do my absolute best." Regarding the awkward situation, he stated, "I think that might be something that would stick in the back of my mind. It's not to say I couldn't put it out." In response to a question regarding the potential chilling effect that serving on the jury may have on his professional relationships, Mr. I stated that he would listen to the facts and "make the right decision, you know, irregardless of that situation."

¶ 100 These statements were sufficient to support the court's finding that he could "do what the law requires" and would deal with any consequences of his relationship with law enforcement agencies. *See People v. Blessett*, 155 P.3d 388, 393 (Colo.App.2006) (denial of challenge for cause not abuse of discretion where, although prospective juror's statements evinced a belief that police officers were more credible than other witnesses, he indicated that he could decide the

case based on the law and the evidence); *see also Samson*, ¶¶ 22–23 (juror's longstanding professional and personal relationships with law enforcement officers did not mandate disqualification where juror provided statements to the court indicating he could be fair, follow instructions, and listen to the evidence in its totality); *People v. Vigil*, 718 P.2d 496, 501 (Colo.1986) (although juror whose brother was a law enforcement officer indicated he may give more weight to testimony of law enforcement people, disqualification not required where he stated he would follow instructions on credibility and could be fair and impartial).

¶ 101 In sum, because the record supports the trial court's decision to deny the challenge for cause, we perceive no error.

## C.  Evidence of Uncharged Conduct

¶ 102 Defendant next contends that the trial court erred when it admitted, as res gestae, (1) defendant's statements concerning his prior acts of buying, selling, and receiving marijuana; and (2) defendant's wife's testimony regarding marijuana and weapons in their home. He urges that, instead, the evidence should have been analyzed pursuant to CRE 404(b). To illustrate the harm caused by the court's error, defendant argues that admission of the res gestae evidence caused the jury to submit a question during deliberations seeking clarification of the offense date, and further argues that the court's response to the question was erroneously ambiguous and confusing. We perceive no error.

¶ 103 We review a trial court's decision to admit evidence of other acts for abuse of discretion. *See Yusem v. People*, 210 P.3d 458, 463 (Colo.2009); *People v. Jimenez*, 217 P.3d 841, 864 (Colo.App.2008). We will disturb its ruling on appeal only if the ruling was manifestly arbitrary, unreasonable, or unfair. *Yusem*, 210 P.3d at 463; *Jimenez*, 217 P.3d at 864.

¶ 104 Under CRE 404(b), evidence of other crimes, wrongs, or acts is inadmissible to prove a bad character trait and conformity therewith, but may be admitted to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Courts consider the admissibility of CRE 404(b) evidence under the four-part test set forth in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990). Courts ask whether the prior act (1) relates to a material fact in the case; (2) is logically relevant; (3) is relevant independent of an inference relying on bad character; and (4) has probative value that is not substantially outweighed by the danger of unfair prejudice. *Id.*; *see also Yusem*, 210 P.3d at 463.

¶ 105 Prior acts by a defendant may also be admissible as res gestae evidence, which is evidence "that helps to 'provide the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred.'" *People v. Skufca*, 176 P.3d 83, 86 (Colo.2008) (quoting *People v. Quintana*, 882 P.2d 1366, 1373 (Colo.1994)). Generally, res gestae evidence is linked in time and circumstance to the charged crime; it is admissible to explain "'the events surrounding the crime and the context in which the charged crime occurred.'" *People v. Thomeczek*, 284 P.3d 110, 114 (Colo.App. 2011) (quoting *People v. Lucas*, 992 P.2d 619, 624 (Colo.App.1999)). As with other evidence, the res gestae evidence must be relevant and its probative value must not be substantially outweighed by the danger of unfair prejudice. CRE 401, 403; *People v. Gladney*, 250 P.3d 762, 768 (Colo.App.2010). However, the additional procedural protections for CRE 404(b) evidence, articulated in *Spoto*, do not apply to res gestae evidence. *See Thomeczek*, 284 P.3d at 114 (citing *People v. Czemerynski*, 786 P.2d 1100, 1109 (Colo.1990)).

¶ 106 We perceive no abuse of discretion in the trial court's decision to admit the evidence of defendant's prior possession of drugs, prior drug deals, and prior possession of a weapon as res gestae. Defendant was charged with reckless child abuse and possession with intent to distribute marijuana. He was also charged as a special offender on the basis that he possessed a deadly weapon during the commission of and in connection with the drug offense.

¶ 107 The child abuse charge required the prosecution to prove that defendant recklessly permitted his daughter to be unreasonably

placed in a situation that posed a threat of injury to her life or health. The possession with intent to distribute charge required proof that defendant knowingly possessed marijuana with intent to distribute it. Finally, the special offender charge required proof that defendant possessed a deadly weapon during commission of, and in connection with, the marijuana offense.

¶ 108 Evidence of defendant's activities and knowledge relative to the distribution of drugs and possession of weapons is related to defendant's knowledge and intent to distribute the marijuana and his possession of a deadly weapon in connection with that offense. The evidence also related to the dangerous circumstances in which defendant allowed his daughter to live. Thus, the evidence of defendant's other dealings with marijuana and weapons helped explain the events surrounding the crimes and the context in which the charged crimes occurred. *See Quintana,* 882 P.2d at 1373; *Skufca,* 176 P.3d at 86 (in possession with intent to distribute case, evidence of the defendant's prior drug transactions was admissible as res gestae because it "helped give the jury a more complete understanding of the events surrounding the crime"); *People v. Merklin,* 80 P.3d 921, 924–25 (Colo.App. 2003) ("Evidence of criminal conduct that occurs contemporaneously with or is part and parcel of the crime charged is considered part of the res gestae of that offense, and consequently is not subject ... to the general rule that excludes evidence of prior criminality." (internal quotation marks omitted)).

¶ 109 Even assuming that the evidence should have been analyzed as other bad acts under CRE 404(b), the court here provided the basic CRE 404(b) protections. Prior to the admission of the evidence, the court instructed the jury not to use the other act evidence to assess defendant's character, but to consider it only for limited purposes for which it was offered, namely, to show (1) the circumstances and environment that were present in the home; (2) proof of defendant's intent to distribute marijuana that was found in his home; and (3) defendant's reaction to events prior to November 26, 2007, which may have led up to the November 26, 2007 events. Additionally, the written jury instructions included an instruction as to the use of evidence admitted for a limited purpose.

¶ 110 We also conclude that the probative value of this evidence outweighed any potential for unfair prejudice, and that prejudice was mitigated by the trial court's limiting instructions.

¶ 111 Next, we address and reject defendant's assertion that the admission of the evidence of defendant's prior drug dealing triggered an erroneous response to a jury question during deliberations regarding the special offender charge.

¶ 112 During deliberations, the jury asked the court the following question:

(1) Is the charge of having a deadly weapon in conjunction with possession with intent to distribute marijuana isolated solely to the date of Nov. 26, 2007, and/or including incidents prior? If not, there is discrepancy between the verdict forms because it does not list a date on the verdict form, and yet a date is listed in instruction 29.

¶ 113 The defense proposed that the court respond by providing: (1) "Yes, the date of offense for the charge referred to in Instruction 29 is limited to November 26, 2007. See instruction 26." Instead, the court gave the jury a written response that said:

Regarding [question 1], your deliberations and verdicts concern the incidents of November 26, 2007. In making these determinations and reaching your verdicts regarding the events of November 26, 2007 you may consider any evidence received or admitted during the trial. Please refer to the third paragraph of instruction # 1 as well as all other instructions.

¶ 114 The third paragraph of Instruction 1 provided: "During the course of the trial you received all of the evidence that you may properly consider to decide the case. Your decision must be made by applying the rules of law which I give you to the evidence presented at trial. Neither sympathy nor prejudice should influence your decision."

¶ 115 A trial court must instruct the jury correctly on all matters of law, *People v.*

*Garcia,* 28 P.3d 340, 343 (Colo.2001), and likewise must provide "concrete and unambiguous" responses to any jury questions on offense elements, *People v. Hoover,* 165 P.3d 784, 796 (Colo.App.2006) (citing *Leonardo v. People,* 728 P.2d 1252, 1256 (Colo.1986)). Accordingly, we review a legal challenge to a jury instruction de novo. *People v. Torres,* 224 P.3d 268, 278 (Colo.App.2009) (whether court was required to give unanimity instruction); *but cf. People v. Gallegos,* 226 P.3d 1112, 1115 (Colo.App.2009) (trial courts have "substantial discretion in formulating the jury instructions, so long as they are correct statements of the law and fairly and adequately cover the issues presented").

¶ 116 On appeal, defendant asserts that the court's written response improperly instructed the jury that it could consider and convict defendant based on his conduct on dates other than the offense date. We are not persuaded.

¶ 117 The court's response informed the jury that its deliberations and verdicts concerned the incidents of November 26, 2007. The response also noted that the jury could consider any evidence presented at trial in reaching its verdicts. The response, when read as a whole with the other instructions provided to the jury, adequately informed the jury of the law. *See Gallegos,* 226 P.3d 1112. Thus, we perceive no error.

## IV. Conclusion

¶ 118 The judgment and sentence are affirmed.

JUDGE ROMÁN concurs.

JUDGE WEBB concurs in part and dissents in part.

JUDGE WEBB concurring in part and dissenting in part.

¶ 119 This case involves an attempted invasion of defendant's home by armed intruders. When those intruders forced open his front door, seven members of his immediate family were also present. He repelled the invasion by firing a handgun. Yet, in upholding the special offender sentence enhancer for mari-

juana distribution involving use or possession of a deadly weapon, the majority concludes that the trial court did not err in rejecting defendant's tendered instruction on his constitutional right to use a gun to defend his family and himself.

¶ 120 In my view, the absence of such an instruction created a reasonable possibility the jury had to conclude defendant's use of the gun in self-defense was part of the charged marijuana distribution. If so, the jury would have improperly found the sentence enhancer based only on this constitutionally protected use. Therefore, I respectfully dissent from that portion of the majority's opinion.

¶ 121 Where the trial court rejects a defendant's tendered instructions, the harmless error standard applies. *People v. Witek,* 97 P.3d 240, 245 (Colo.App.2004). "Under the harmless error rule, an error in a criminal trial will be disregarded if there is not a reasonable possibility that the error contributed to the defendant's conviction." *Tevlin v. People,* 715 P.2d 338, 342 (Colo.1986). Thus, "[t]he proper inquiry in determining a harmless error question is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings." *People v. Robinson,* 874 P.2d 453, 458 (Colo. App.1993).

¶ 122 To begin, the Colorado Constitution enumerates "defending their lives," among "essential and inalienable rights" of "*[a]ll* persons." Colo. Const. art. II, § 3 (emphasis added); *see Vigil v. People,* 143 Colo. 328, 333–34, 353 P.2d 82, 85 (1960).[1] As well, it recognizes a person's right "to keep and bear arms in defense of his home, person and property." Colo. Const. art. II, § 13; *see City of Lakewood v. Pillow,* 180 Colo. 20, 23, 501 P.2d 744, 745 (1972) (invalidating as overly broad a municipal ordinance that "makes it unlawful for a person to possess a firearm in a vehicle or in a place of business for the purpose of self-defense").

¶ 123 Because the federal constitution does not expressly enumerate a right of self-de-

---

1. Although the majority appears to endorse rational basis review, "[t] he constitutional analysis applied to the laws that impede upon these inalienable rights is a means-end review, legally referred to as a substantive due process analysis." *Nixon v. Commonwealth,* 576 Pa. 385, 839 A.2d 277, 286 (2003).

fense and the wording of article II, section 13 is broader than that of the Second Amendment, ("the right of the people to keep and bear Arms[ ] shall not be infringed"), the underlying right is broader too. *See People v. McNeese,* 892 P.2d 304, 323 (Colo.1995) ("We noted that, unlike the more narrow constitutional provisions of other states that 'merely ... guarantee the collective or "state's right" ... for maintenance of the militia,' the right created by our constitution was intended to allow citizens 'to bear arms for purposes of self-defense and the defense of property.' " (quoting *Robertson v. City and Cnty. of Denver,* 874 P.2d 325, 327–28 n. 6 (Colo.1994))). *Compare People v. DeWitt,* 275 P.3d 728, 733 (Colo.App.2011) (under the Colorado Constitution, "a defendant charged with [possession of a weapon by a previous offender] may raise as an affirmative defense that he or she possessed a weapon for the constitutionally protected purpose of defending his or her home, person, or property"), *and People v. Carbajal,* 2012 COA 34, ¶ 11, —— P.3d —— (same) (*cert. granted* Oct. 29, 2012), *with United States v. Barton,* 633 F.3d 168 (3d Cir.2011) (federal statute prohibiting the possession of firearms by a convicted felon did not violate the Second Amendment, either facially or as applied to defendant).

¶ 124 The sentence enhancer requires a finding that a defendant "used, displayed, possessed, or had available for use a deadly weapon." Ch. 71, sec. 1, § 18–18–407(1)(f), 1992 Colo. Sess. Laws 362. Such a determination constitutes an extraordinary aggravating circumstance, and the court must "sentence the defendant to the department of corrections for a term of at least the minimum term of years within the presumptive range for a class 2 felony but not more than twice the maximum term of years within the presumptive range for a class 2 felony." *Id.*

¶ 125 The sentence enhancer has been held not to violate a defendant's state constitutional right to possess arms for self-defense because section 18–18–407(1)(f) requires the prosecution "to show some nexus between the deadly weapon and the drug offense upon which the enhanced sentence is based." *People v. Atencio,* 878 P.2d 147, 150 (Colo.App. 1994). But *Atencio*—a pure possession case—leaves unanswered the more nuanced question that this case presents: whether,

without the tendered instruction, the jury could have found the sentence enhancer applied based solely on defendant's use of the gun to defend his family and himself.

¶ 126 Here, consistent with the statute, the sentence enhancer instruction encompassed "use," "possession," and "have available." Similarly, the corresponding interrogatory read: "On November 26, 2007, did the defendant use, possess, or have available for use a deadly gun during the commission of and in connection with the crime of Possession With Intent to Distribute Marihuana." But these alternative bases exposed defendant to a special offender finding because he used a gun only to protect his family and himself from the intruders.

¶ 127 True, the prosecution presented evidence to prove that defendant possessed or had available the gun as part of his marijuana distribution out of his house. Yet, the prosecution's evidence showed that defendant used the gun only once—in a circumstance of clear self-defense. And because the charges against defendant included child abuse resulting in death, the jury heard extensive evidence of that use in the shoot-out with the intruders.

¶ 128 Specifically, the prosecution's theory was that by selling drugs out of his home, defendant recklessly placed his daughter in circumstances that threatened her life and resulted in her death. *See* §§ 18–6–401(1)(a), (7)(a)(I), C.R.S.2013. In attempting—albeit unsuccessfully—to convince the jury of defendant's recklessness, the prosecution offered evidence and testimony from multiple witnesses of how many rounds had been fired, by whom, and in what directions. The prosecution discussed this evidence at length in closing argument; it mentioned only twice—and briefly—defendant's possession of the gun as the basis for the jury to find him a special offender. Based on this evidence and argument, the jury could have concluded that the sentence enhancer had been proven because defendant used the gun in self-defense.

¶ 129 Such a conclusion would punish defendant for exercising his constitutional right of self-defense. But defendant's tendered instruction—or a reasonable derivation of it, which the trial court has an obligation to

create, *see, e.g., People v. Nunez,* 841 P.2d 261, 265 (Colo.1992) ("[A] trial court has an affirmative obligation to cooperate with counsel to either correct the tendered theory of the case instruction or to incorporate the substance of such in an instruction drafted by the court.")—would have prevented the jury from finding the sentence enhancer based *solely* on use of the gun in self-defense.[2] Thus, the absence of an instruction on defendant's right to use his gun in self-defense cannot be said to be harmless because of this "reasonable possibility that the error contributed to the defendant's conviction." *People v. Taylor,* 197 Colo. 161, 164, 591 P.2d 1017, 1019 (1979).

¶ 130 The United States Court of Appeals cases cited by the majority regarding the interplay between the Second Amendment and federal statutes similar to section 18–18–407(1)(f) do not defeat the propriety of the tendered instruction, for two reasons. First, as indicated, the Second Amendment is narrower than its analog in the Colorado Constitution. Second, those cases focus on possession and hold that such possession must be for a lawful purpose. *See United States v. Bryant,* 711 F.3d 364, 368–71 (2d Cir.2013) (possession in furtherance of drug trafficking operation); *United States v. Jackson,* 555 F.3d 635, 636 (7th Cir.2009) (same); *United States v. Greeno,* 679 F.3d 510, 520 (6th Cir.2012) (same). While the defendants in those cases may have claimed to have possessed the guns for self-defense, none of the cases involved a defendant's use of a gun in self-defense, as occurred here. *See also United States v. Huet,* 665 F.3d 588, 601 (3d Cir.2012) ("The Government readily concedes that Huet would not violate § 922(g)(1) simply by possessing a firearm. She would, however, violate § 922(g)(1) and § 2 by aiding and abetting a felon to possess a firearm." (emphasis omitted)).

¶ 131 Nor am I persuaded by the majority's explanation that "the jury would not have been able to find that the weapon was used *solely* for a constitutional self-defense

purpose, because the jury was required to find that the gun was used, possessed, or available for use during the commission of and *in connection with* the crime of possession with intent to distribute marihuana." On the evidence presented here, the majority is correct that a "defendant's use or possession of a gun can simultaneously be for the purpose of self-defense against intruders, and also for the purpose of protecting a drug supply from intruders." But from the evidence, the jury could also have concluded—if properly instructed—that defendant used the gun only in self-defense, not in connection with the marijuana offense.

¶ 132 For this reason, in my view, analysis based on simultaneity assumes away the very problem that it purports to solve—the tension between the special offender statute and defendant's essential and inalienable constitutional right to defend his family and himself with a gun. *See People v. Blue,* 190 Colo. 95, 103, 544 P.2d 385, 391 (1975) ("We do not read the Colorado Constitution as granting an absolute right to bear arms under all situations. It has limiting language dealing with defense of home, person, and property."). Here, because the same conduct *could* both exercise this right and trigger the sentence enhancer does not mean that the jury *must* so conclude. Yet, under the majority's assumption—"the simultaneous use of the gun to protect drugs"—when the armed intruders forced open his front door, defendant could not protect lives without thereby creating proof of nexus based on also protecting his drugs.

¶ 133 I reject this assumption because it deprives the jury of the opportunity to weigh the nexus requirement against defendant's subjective intent and the objective exigency. Instead, an appropriate constitutional self-defense instruction would have resolved this dilemma by allowing the jury to consider the immediate need to defend the lives of those present as dispelling any inference of simultaneous use to protect drugs on the premises.[3] And here, the evidence was sufficient to

2. Defendant argues that this tension shows the statute to be fatally overbroad. I decline to address overbreadth because giving the instruction would have protected defendant's constitutional rights and saves the statute from potential invalidation. *See People v. Montour,* 157 P.3d 489,

503–04 (Colo.2007) ("[C]ourts have a duty to interpret a statute in a constitutional manner where the statute is susceptible to a constitutional construction.").

3. This approach is not foreclosed by *Heller. See Moore v. Madigan,* 702 F.3d 933, 935–36 (7th

give such an instruction. *See People v. Lawson*, 15 P.3d 791, 794 (Colo.App.2000) ("If the record contains any evidence tending to establish self-defense, a defendant is entitled to have the jury instructed concerning it.").

¶ 134 Accordingly, because in my view the trial court erred by refusing the tendered instruction on defendant's constitutional right to use his gun in self-defense, I would vacate the special offender sentence enhancer and remand for resentencing. In all other respects, I concur in the majority's opinion.

Cir.2012) ("Nor can we ignore the implication of the [*Heller*] analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home.").